UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TODD JOHNSON,

                                        Plaintiff,

            vs.                                                    9:09-CV-626
                                                                   (FJS/ATB)
CHRISTOPHER FERNANDEZ, *et al.*,

                                        Defendants.

_____

TODD JOHNSON, Plaintiff *pro se*
MICHAEL G MCCARTIN, Ass't Attorney General, for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT RECOMMENDATION

This matter was referred for Report and Recommendation, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Frederick J.

Scullin, Jr., Senior United States District Judge.  On November 4, 2010, this case was

reassigned to me from Magistrate Judge David R. Homer.  (Dkt. No. 48).

In this civil rights complaint (Dkt. No. 1), Plaintiff alleges that Defendants

violated his rights under the First, Eighth, and Fourteenth Amendments.  Plaintiff

seeks $1 million in damages, as well as injunctive relief.  Presently before this court is

Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(b).  (Dkt.

No. 39).  Plaintiff responded in opposition to the motion.  (Dkt. No. 43).  For the

following reasons, the court recommends granting Defendants' motion, and

dismissing the complaint in its entirety.

**DISCUSSION**

I.   Facts

    A.   **Excessive Force Claims Against**
         **Christopher Fernandez and Jason Yung**

Plaintiff alleges[1] that he was assaulted by Defendant Christopher Fernandez, a correctional officer, on February 9, 2008, while incarcerated at Coxsackie Correctional Facility ("Coxsackie"). (Dkt. No. 1, Compl. at 8[2]; Dkt. No. 39-3, Pl.'s Dep. at 13). At approximately 3:00 P.M., Defendant Fernandez approached Plaintiff's cell and started screaming about people who were "loud at the gate" earlier in the week. (Compl. at 8; Pl.'s Dep. at 12). Defendant Fernandez told another correctional officer, known only as Officer Ryan, to open Plaintiff's cell. (Compl. at 8; Pl.'s Dep. at 12-13). After Officer Ryan opened the cell, Defendant Fernandez told Plaintiff to "step out" and "place [his] hands on the wall." (Compl. at 8; Pl.'s Dep. at 13) Defendant Fernandez allegedly began punching Plaintiff in the ribs once he exited his cell. (Compl. at 8; Pl.'s Dep. at 16). Although Defendant Fernandez supposedly told Plaintiff to "fight back," Plaintiff refused to do so. (Compl. at 8; Pl.'s Dep. at 16). Defendant Fernandez then began "trashing" Plaintiff's cell, as if he were searching for contraband. (Compl. at 8; Pl.'s Dep. at 13). Finding none, Defendant Fernandez ordered Plaintiff to get on his knees. (Compl. at 8; Pl.'s Dep. at 13). Defendant

---

[1] Plaintiff was deposed on February 23, 2010 (Dkt. No. 39-3), and this court has incorporated facts that were brought out in plaintiff's deposition.

[2] All references to page numbers in the Complaint will be to the page numbers assigned by the court's electronic docketing system.

Fernandez then kicked Plaintiff's lower back, causing Plaintiff's neck to snap.  *Id.* (Compl. at 8; Pl.'s Dep. at 13).

After Defendant Fernandez locked Plaintiff in his cell, Defendant Fernandez walked over to Inmate Green's cell and ordered Officer Ryan to open that cell. (Compl. at 8; Pl.'s Dep. at 25).  Although Plaintiff did not see what transpired immediately after Defendant Fernandez entered Inmate Green's cell, Plaintiff claims that he later witnessed Defendant Fernandez slapping Inmate Green.  (Compl. at 8; Pl.'s Dep. at 26).  Defendant Fernandez then proceeded to Inmate Palmer's cell and ordered Officer Ryan to open that cell.  (Compl. at 8; Pl.'s Dep. at 30).   Plaintiff does not claim that he witnessed any assault on Inmate Palmer, but claims that he heard repeated sounds of a stick hitting a body and cries for help.  (Compl. at 8; Pl.'s Dep. at 35).  Plaintiff also claims to have witnessed Inmate Palmer being dragged to the day room in bloody clothing.  (Compl. at 8; Pl.'s Dep. at 35).

On February 15, 2008, Plaintiff states that a correctional officer told Plaintiff that he was being called as a witness in Inmate Palmer's disciplinary hearing that arose from the February 9 incident.  (Compl. at 8; Pl.'s Dep. at 59).  The officer asked Plaintiff: "Do you want to get involved with that?"  (Compl. at 8)*.*  After Plaintiff responded affirmatively, the officer allegedly told Plaintiff that getting involved was not a "good idea."  *Id.*  After that officer left, another officer approached Plaintiff and asked him the same question.  *Id.*  Once again, Plaintiff replied affirmatively.  *Id.*  The officer then told Plaintiff that he would be called after lunch.  *Id.*

Plaintiff states that he wanted to bring a written statement and other documents

into Inmate Palmer's hearing.  (Compl. at 8; Pl.'s Dep. at 64-65).  On his way to the hearing room, after retrieving those items and placing them in an envelope, Plaintiff claims that he was stopped by Defendant Sergeant Jason Yung and an unidentified correctional officer.  (Compl. at 8; Pl.'s Dep. at 65).  Defendant Yung then allegedly threatened Plaintiff with being "locked up" if he testified at the hearing.  (Compl. at 8; Pl.'s Dep. at 64).

As Plaintiff sat in the waiting pen, Correctional Officer (C.O.) Nieves told Plaintiff that his envelope would need to be searched before he could bring it into the hearing room.  (Dkt. No. 39-11, Disciplinary Hr'g at 11; Dkt. No. 39-12, Hr'g Papers at 4).  Plaintiff then shouted that he would not permit the officers to search his envelope, claiming that C.O. Nieves was interfering with his ability to testify for Inmate Palmer.  (Pl.'s Dep. at 65; Disciplinary Hr'g at 11-12; Hr'g Papers at 4).  C.O. Nieves then issued Plaintiff a disciplinary ticket.  (Hr'g Papers at 4).

Based upon this misbehavior, Defendant Yung and another officer escorted Plaintiff back to his cell to pack for confinement in the special housing unit ("SHU").  (Compl. at 8; Disciplinary Hr'g at 17).  During the escort to SHU, Defendant Yung allegedly called for more officers.  (Compl. at 8).  Plaintiff claims that Defendant Yung and the other officers began punching and kicking Plaintiff in the face and ribs.  (Compl. at 8; Pl.'s Dep. at 70-73).

Once Plaintiff arrived at SHU, Plaintiff told his mental health counselor, Mr. Tatum, that he was crying because he had been assaulted.  (Compl. at 8; Pl's Dep. at 78).  Mr. Tatum transferred Plaintiff to the Office of Mental Health ("OMH")

4

infirmary.  (Compl. at 8; Pl.'s Dep. at 78).  Plaintiff claims that was not seen by a doctor until February 27, 2008.  (Compl. at 15).  He believes that the delay in treatment occurred because he told Investigator Begmann of the Inspector General's Office about the February 9 and 15 assaults.  *Id.*

### B.    Mail Interference Claim Against M. Bathrick

As an initial matter, the court notes that Plaintiff fails to allege which Defendant (or any other individual) deprived him of his First Amendment right to the free flow of mail.  Although Defendant Bathrick is named as a defendant in the caption of the Complaint and is later identified as a clerk in the Inmate Account Unit (Compl. at 3), the Complaint fails to contain any allegations indicating how Defendant Bathrick violated the law or injured Plaintiff.  Under these circumstances, the claim would ordinarily have been subject to dismissal.[3]  Defendants, however, have interpreted the allegation of mail interference to refer to Defendant Bathrick.  (Dkt. No. 39-14, Defs.' Mem. of Law at 15).  Moreover, Plaintiff states, in his opposition to summary judgment, that Defendant Bathrick is the defendant responsible for this alleged violation of Plaintiff's First Amendment rights.  (Dkt. No. 43 at 24, Pl.'s 7.1 Statement ¶ 14).  Accordingly, the Court will construe the Complaint as asserting a First

---

[3]  *See, e.g.*, *Orraca v. McCreery*, No. 9:04-CV-1183, 2006 U.S. Dist. LEXIS 22941, 2006 WL 1133254, at *6 (N.D.N.Y. Apr. 25, 2006) (dismissing claim against defendant where defendant named in complaint but complaint and supporting documents "fail[ed] to disclose any basis on which to conclude" that defendant was personally involved in the alleged unlawful conduct); *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999) ("Where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted."), *aff'd*, 210 F.3d 354 (2d Cir. 2000).

Amendment mail interference claim against Defendant Bathrick.  *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (holding that where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest").

Plaintiff alleges that his First Amendment rights were violated at Coxsackie because he was denied his right to "communicate with the outside world."  (Compl. at 13).  Following the alleged assaults discussed above, Plaintiff claims that he was depressed and wanted to communicate with this family.  *Id.*  Plaintiff states, however, that he was prevented from writing to his family because he was not permitted to buy stamps when he arrived at the SHU on February 15, 2008.  (Pl.'s Dep. at 102).  He states that he was unable to obtain stamps until March 2008.  *Id.* at 106.

### C.    Due Process Claims Against Defendant Kim Gerwer

Defendant Kim Gerwer, a Coxsackie Education Supervisor, presided over Plaintiff's Tier III hearing.  (Compl. at 15; Disciplinary Hr'g at 1).  Plaintiff alleges that his due process rights were violated at this hearing in a number of ways.  (Compl. at 15).  First, he claims he was not provided with notice of the charges against him twenty-four hours before the hearing.  *Id.*  Second, he claims that Defendant Gerwer refused, without a legitimate reason, to call a witness that would have supported Plaintiff.  *Id.*  Third, Defendant Gerwer failed to collect documents that Plaintiff had requested.  *Id.*  Fourth, Defendant Gerwer relied upon Officer Germaine's testimony, even though the officer did not endorse the disciplinary ticket as someone with "personal knowledge" of the incident.  (Pl.'s Dep. at 85–87).  Finally, Plaintiff was not

provided with an impartial hearing because Defendant Gerwer had stated that the officer who wrote the ticket was a "good person." *Id.* at 82.[4]

## II.   Legal Standard for Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material

---

[4] Plaintiff also appears to assert a conditions of confinement claim. (Compl. at 14). Plaintiff, however, has failed to make any allegations about how any of the named defendants are related to a possible condition of confinement claim. Accordingly, the Court will only address the claims asserted against the named defendants.

facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); *Salahuddin v. Goord*, 467 F.3d at 272. "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (citing, *inter alia*, *Burgos v. Hopkins*, 14 F.3d at 790 (a court is to read a *pro se* party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest")). "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III.   Eighth Amendment Excessive Force Claims

Defendants Fernandez and Yung argue that Plaintiff has failed to properly exhaust the excessive force claims. (Defs.' Mem. of Law at 5). The Prison Litigation Reform Act's ("PLRA") exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes regardless of the subject matter of the claim. *See, e.g.*, *Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir. 2004). In *Woordford v. Ngo*, 548 U.S. 81, 126 S. Ct. 2378, 765 L. Ed. 368 (2006), the Supreme Court held that the PLRA required "proper" exhaustion as a

8

prerequisite to filing a section 1983 action in federal court. *Id.* at 92–93. "Proper"

exhaustion means that the inmate must complete the administrative review process in

accordance with the applicable procedural rules, including deadlines, as a prerequisite

to bringing suit in federal court. *See id.* at 89–94. An inmate must appeal any denial

of his grievance to the highest available administrative level. *Martinez v. Williams*,

349 F. Supp. 2d 677, 682 (S.D.N.Y. 2004).

However, the Second Circuit has held that certain exceptions to exhaustion

apply. The proper inquiry is to determine "whether: (1) administrative remedies were

in fact available to the prisoner; (2) the defendants may have forfeited the affirmative

defense of non-exhaustion by failing to preserve it . . . or whether the defendants' own

actions inhibiting the inmate's exhaustion of remedies may estop one or more of the

defendants from raising the plaintiff's failure to exhaust as a defense; and (3) special

circumstances may have been plausibly alleged that justify the prisoner's failure to

comply with administrative procedural requirements." *Chavis v. Goord*, 333 Fed.

App'x 641, 643 (2d Cir. 2009) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d

Cir. 2004) (internal quotation marks omitted).

The grievance procedure in New York is a three-tiered process. The inmate

must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC").

N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of

the IGRC may be appealed to the Superintendent of the facility. *Id.* § 701.5(c).

Adverse decisions at the Superintendent's level may be appealed to the Central Office

Review Committee (CORC). *Id*. § 701.5(d). The court also notes that the regulations

governing the Inmate Grievance Program (IGP) encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a).

There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8. Under this procedure, the inmate may (but is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.8. The inmate then files a grievance under the normal procedures outlined above; but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id.* § 701.8(b). Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment. If so, the Superintendent shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* §§ 701.8(c); 701.8(d)(1)–(d)(3). An appeal of the adverse decision of the Superintendent may be taken to the Central Office Review Committee as in the regular grievance procedure. *Id.* § 701.8(h).

Here, Defendants argue that Plaintiff did not properly exhaust his administrative remedies because he failed to grieve the excessive force claims through the state's three-tiered process in a timely and appropriate manner. (Defs.' Mem. of Law at 5). Plaintiff claims that a grievance officer told him that the grievance office did not

10

handle staff assaults, and that he should, instead, complain to the Inspector General. (Compl. at 1; Pl's Dep. at 52–53; Pl.'s 7.1 Statement ¶ 1).  Plaintiff then wrote to the Inspector General's Office. (Pl.'s Dep. at 36–37).

An inmate's attempt to exhaust by simply writing a letter directly to the Inspector General will not suffice to exhaust administrative remedies.  *See Grey v. Spearhawk*, No. 99 CIV. 9871, 2000 U.S. Dist. LEXIS, at *5, 2000 WL 815916 (S.D.N.Y. June 23, 2000) (holding that a complaint filed directly with the Inspector General did not excuse plaintiff from "adhering to the available administrative procedures").  It has been held that "a grievance through informal channels will satisfy the exhaustion requirement if the prisoner thereby obtained a *favorable resolution* of his grievance." *Thomas v. Cassleberry*, 315 F. Supp. 2d 301, 304 (W.D.N.Y. 2004) (citations omitted) (emphasis added).  The exhaustion requirement will be satisfied in that situation because the inmate would not have any reason to appeal a favorable resolution.  *Andrews v. Cruz*, No. 04 Civ. 566, 2010 U.S. Dist. LEXIS 28124, at *16, 2010 WL 1141182, at *6 (S.D.N.Y. Mar. 24, 2010) (citations omitted).  Thus, Plaintiff did not exhaust administrative remedies by writing to the Inspector General's Office, even though the Inspector General investigated plaintiff's allegations and found them to be unsubstantiated.

Defendants may "forfeit the affirmative defense of non-exhaustion . . . [if] defendants' own actions inhibit[ed] the inmate's exhaustion of remedies . . . ." *Chavis v. Goord*, 333 Fed. App'x at 641 (citations omitted); *see, e.g.*, *Jacoby v. Phelix*, No. 9:07-CV-872 (DNH/ATB), 2010 U.S. Dist. LEXIS 44222, at *26-28, 2010 WL

11

1839299, at *8–9 (N.D.N.Y. Mar. 31, 2010) (Baxter, Mag. J.) (summary judgment denied where issues of fact remained on whether plaintiff was threatened by defendants into withdrawing his grievance), *report-recommendation adopted*, 2010 U.S. Dist. LEXIS 44201, 2010 WL 1839264 (N.D.N.Y. May 6, 2010) (Hurd, J.). Although plaintiff claims that an unidentified grievance officer told him that the grievance office did not handle staff assaults, nothing in the record indicates that Defendants Fernandez and Yung or any other DOCS employee actually inhibited Plaintiff's ability to exhaust administrative remedies.  First, the IGP Supervisor at Coxsackie denied telling plaintiff that allegations of assault are not grievable.  (Dkt. No. 39-7, Bellamy's 7/30/2008 Letter at 1).   Further, plaintiff has acknowledged that he wrote one grievance regarding the assaults on February 25, 2008, and then wrote another grievance after March 8, 2008, when the grievance office supposedly told him that "they do not deal with assaults on inmates by staff."[5]  (Dkt. No. 39-8, Pl. 6/20/2008 Letter at 4).  Whatever the Grievance Supervisor said, plaintiff's own statements indicate that he was not deterred from pursuing grievance regarding the alleged assaults.

Plaintiff states that the he did mention the February 9 and February 15 incidents in a grievance that he filed on June 25, 2008.  (Pl.'s Dep. at 55-56).  The regulations provide, however, that an inmate must file a grievance within twenty-one days of the

---

[5] Contrary to this purported advice, DOCS regulations clearly permit an inmate to file harassment grievances.  7 NYCRR § 701.8; see also id. § 701.2(e) (defining "harassment grievances" as "those grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate").

alleged occurrence.  7 NYCRR § 701.5(a)(1).  An exception to this time limit may be granted based on "mitigating circumstances" if the extension is requested within forty-five days of the alleged occurrence.  7 NYCRR § 701.6(g)(1)(i)(a).  Thus, to the extent that the June 25 grievance complained about the February 9 and 15 assaults, it would have been time-barred.[6]

Plaintiff appealed the denial of his June 25, 2008 grievance.  In the CORC's decision, dated July 30, 2008, the Committee stated that "CORC notes that there is no record of the grievant filing prior grievances addressing the allegations of assaults by staff on 2/9/08 and 2/15/08.  However, it is noted that both allegations were investigated by the Office of the Inspector General and determined to be unsubstantiated." (Dkt. No. 39-6 at 1).  Thus, it is clear from the CORC's response to plaintiff that there was no record of a prior grievance, complaining about these alleged assaults.

Even though the forty-five day window to file a grievance regarding the alleged assaults had already expired, IGP Director Karen Bellamy advised Plaintiff on June 30, 2008, that he could contact the IGP supervisor with his mitigating circumstances. (Dkt. No. 39-7, Bellamy's 7/30/2008 Letter at 1).  There is nothing in the record, however, to indicate that Plaintiff did so.  No rational fact finder could determine that Plaintiff exhausted his administrative remedies, or was deterred from doing so by the

---

[6] Captain J.R. Raymond also responded to a April 29, 2008, letter of complaint  that Plaintiff sent to Superintendent Lape.  (Compl. at 38, Ex. 8).  Even if the April 29 letter could be considered a grievance complaint, it would likewise be time-barred under 7 NYCRR § 701.6(g)(1)(i)(a).

actions of the Defendants or any DOCS employee.[7]   Accordingly, it is recommended that summary judgment be **granted** as to the Eighth Amendment claims.

## IV.   First Amendment Mail Interference Claim

Plaintiff alleges that his First Amendment rights were violated because he was not permitted to buy stamps when he arrived at the SHU on February 15, 2008, and was unable to buy stamps until "some time in March" 2008.  (Pl.'s Dep. at 102, 106). Because he was unable to buy stamps, Plaintiff claims that he was unable to communicate with this family about the February 15 assault.  (Compl. at 13).  At his deposition, however, he admitted that he was able to send out at least one letter between February 15 and March 2008, in which he notified his family about the February 9 assault.  (Pl.'s Dep. at 106).

Under the First Amendment, prisoners have a right to "the free flow of incoming and outgoing mail." *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006) (citations omitted).  A plaintiff may bring a claim under the First Amendment for interference with non-legal mail, based upon his free speech right to send or receive mail.  *See Cancel v. Goord*, No. 00 CIV 2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001).  "[A] prison official's interference with an inmate's mail may violate his

---

[7] *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted).  *See also Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case").

First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.'" *Id.* (quotation omitted).

Although "[t]he boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise[,] . . . when analyzing such claims courts have consistently made distinctions between outgoing mail and incoming mail . . . based on the various rights and interests at stake." *Id.* "[T]he Supreme Court has recognized that 'the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.'" *Id.* (quotation omitted). Thus, "the penological interests for interference with outgoing mail must be more than just the general security interest which justifies most interference with incoming mail." *Id.* (citation omitted). However, when reviewing an interference with mail claim, "district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not obvious on its face." *Davis v. Goord*, 320 F.3d 346, 351-52 (2d Cir. 2003); *see also John v. N.Y.C. Dep't of Corr.*, 183 F. Supp.2d 619, 629 (S.D.N.Y. 2002) (requiring plaintiff to allege facts that show defendants acted with invidious intent and plaintiff was harmed by the interference); *Cancel v. Goord*, 2001 WL 303713 at *6 (dismissing claim where only two incidents of tampering alleged and no other indications of a continuing practice).

In this case, Plaintiff admits that he was able to send out at least one letter between February 15, 2008, and March 2008. (Pl.'s Dep. at 106). Moreover, any

15

inability to send mail to his family was limited to, at most, a one month period because Plaintiff was able to buy stamps in March 2008.[8]  Thus, any alleged occurrences of mail interference were few, any delay was minimal, and there is no indication that it was an ongoing practice.  Plaintiff has also failed to show any harm, physical or otherwise, caused by his failure to communicate with his family, and he has failed to show that Defendant Bathrick (or anyone else) acted with invidious intent.  Accordingly, the Court recommends **granting** Defendants' motion for summary judgment as to Plaintiff's First Amendment claims.

## V.   Due Process Violations

Defendant Kim Gerwer is an Education Supervisor at Coxsackie.  (Dkt. No. 39-10, Gerwer Decl. ¶ 1; Dkt. No. 39-13, Defs.' 7.1 Statement ¶ 2).  She served as the hearing officer for Plaintiff's Tier III disciplinary hearing, which arose from the misbehavior report that was issued on February 15.  (Gerwer Decl. ¶ 2; Defs.' 7.1 Statement ¶ 2).  Plaintiff asserts that Defendant Gerwer's conduct at the disciplinary violated due process.  (Compl. at 15–17).

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).  Due process generally requires that a state afford individuals

---

[8] Plaintiff could not remember the exact time in March that he was able to purchase the stamps. (Pl.'s Depo. at 102).

16

"some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

In *Wolff v. McDonnell*, 418 U.S. 539, 563-64, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill*, 472 U.S. 445, 455, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985) (some evidence standard); *McCann v. Coughlin*, 698 F.2d 112, 121–22 (2d Cir. 1983) (fair and impartial hearing officer).

## A.    Liberty Interest

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995). The Second Circuit, however, has refused to set a bright line rule on when confinement becomes atypical. Instead, "in order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin*, 132 F. 3d 133, 137 (2d Cir. 1998) (citations omitted).

17

Here, Plaintiff was sentenced to 180 days of SHU confinement. (Disciplinary Hr'g at 49). He also lost commissary, phone, and package privileges for 180 days. *Id.* The Second Circuit has found that SHU confinement for 180 days may impose an "atypical and significant hardship." *See Kalwasinski v. Morse*, 201 F.3d 103, 106-08 (2d Cir. 1999) (per curiam). Defendants do not address this issue, and the court will assume that plaintiff had a protected liberty interest without further analysis because the court finds that plaintiff received due process in any event.

## B.    Notice

Generally a prisoner must be provided with advanced written notice of the charges against him at least twenty-four hours prior to the hearing. *Wolff v. McDonnell*, 418 U.S. at 564–66; *see also Taylor v. Rodriguez*, 238 F.3d 188, 192 (2d Cir. 2001); *Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986).

In this case, Plaintiff argues that his due process rights were violated because he did not receive notice of the charges against him at least twenty-four hours before the hearing. (Compl. at 15; Pl.'s Dep. at 84–85). Plaintiff admitted at his disciplinary hearing that he was served with formal notice of the charges on February 20, 2008, at 9:20, but it is unclear from the hearing transcript and other documents in the record whether Plaintiff was served at 9:20 A.M. or 9:20 P.M. (Disciplinary Hr'g at 1). The disciplinary hearing commenced on February 21, 2008, at 11:30 A.M. *Id.* If Plaintiff were served at 9:20 P.M., then he would not have received exactly twenty-four hour notice. Even assuming that plaintiff's allegation about the time that the misbehavior report was served is true, his due process rights were not violated by what was

18

ultimately a technicality that had absolutely no impact upon plaintiff's right to proper notice of the disciplinary charges.

The purpose of the twenty-four hour rule is to provide inmates with sufficient time to prepare to defend charges filed against them. *See Wolff v. McDonnell*, 418 U.S. at 564; *Benitez v. Wolff*, 985 F.2d 662, 665 (2d Cir. 1993). A review of the hearing transcript shows that Plaintiff received sufficient notice to prepare for the hearing. Although the hearing began at 11:30 A.M. on February 20, 2008, Defendant Gerwer adjourned the hearing at 11:35 A.M., five minutes after the hearing started. (Disciplinary Hr'g at 3). Plaintiff did not have to defend himself against anything on February 20th. The hearing did not commence again until one week later, on February 27, 2008, at 1:29 P.M. *Id.* This six-day adjournment, which guaranteed that Plaintiff would have sufficient time to prepare for his defense, cured any deficiencies that may have occurred. The February 27th hearing was also adjourned at 2:05 P.M. and began again on March 6 at 3:25 P.M. *Id.* at 22. The second adjournment was necessary because Defendant Gerwer wanted secure the witnesses that Plaintiff requested. *Id.* The March 6 hearing adjourned at 3:45 P.M. so that Defendant Gerwer could secure another witness that Plaintiff requested. *Id.* at 32. The hearing reconvened on March 10 at 12:45 P.M. when that witness became available to testify. *Id.* The hearing was adjourned on at least three different occasions, ensuring that Plaintiff had sufficient time to prepare to defend the charges against him. Plaintiff has not alleged, and cannot claim, any prejudice to him that resulted from the fact that the initial hearing may have started less than twenty-four hours after he was served with the misbehavior

19

report, because there was no "hearing" on that day.  Plaintiff had plenty of time to defend against the charges and to produce evidence and witnesses in his defense.

### C.    Evidence and Witnesses

An inmate has a right to call witnesses and present evidence in his or her defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals."  *Wolff v. McDonnell*, 418 U.S. at 566; *see also Ponte v. Real*, 471 U.S. 491, 496, 105 S. Ct. 2192, 85 L. Ed. 2d 553 (1985) ("Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority . . . .") (citations omitted).  Moreover, a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence.  *See Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (citing *Wolff v. McDonnell*, 418 U.S. at 566).  A hearing officer may refuse to call a witness "on the basis of relevance or lack of necessity."  *Kingsley v. Bureau of Prisons*, 937 F.2d at 30; *see also Scott v. Kelly*, 962 F.2d 145, 145-47 (2d Cir. 1992) ("It is well settled that an official may refuse to call a witness as long as the refusal is justifiable.").

Plaintiff alleges that his due process rights were violated because Defendant Gerwer excluded a log book from evidence.  (Pl.'s Dep. at 88-89; Disciplinary Hr'g at 29–30).  C.O. Nieves's signature appears on a misbehavior report dated February 15, 2008.  (Dkt. No. 39-12, Disciplinary Hr'g Papers at 4).  Plaintiff requested the log book because he did not believe that C.O. Nieves was assigned to the site of the incident at the time it occurred.  (Pl.'s Dep. at 88; Disciplinary Hr'g at 29).  C.O.

20

Nieves testified at the disciplinary hearing that she wrote the February 15 report because Plaintiff had disobeyed her orders. (Disciplinary Hr'g at 11–12). Plaintiff questioned C.O. Nieves at the disciplinary hearing. *Id.* at 12–18. C.O. Donovan also testified that C.O. Nieves was present at the site of the incident. (Disciplinary Hr'g at 32). Plaintiff also had an opportunity to question C.O. Donovan. *Id.* at 33–34.

Thus, Defendant Gerwer had a rational basis to conclude that excluding the log book was proper because its inclusion was unnecessary as C.O. Nieves's presence at the site of the incident was substantiated by C.O. Donovan. Plaintiff questioned both officers at the disciplinary hearing. Since C.O. Nieves was the officer claiming that plaintiff violated her orders, the log book, showing whether she was assigned to the location in question at the time of the incident, was totally irrelevant.

Defendant Gerwer also allegedly refused, without a legitimate reason, to let Plaintiff call Mr. Tatum to testify on Plaintiff's behalf. (Compl. at 15; Pl.'s Dep. at 90). Plaintiff wanted Mr. Tatum, a mental health counselor, to testify about Plaintiff's mental state after the alleged February 15th assault. (Pl.'s Dep. at 90; Disciplinary Hr'g at 25). Plaintiff admits, however, that Mr. Tatum was not present at the time of the incident that gave rise to the disciplinary hearing, and plaintiff's mental state when he was taken to SHU had nothing to do with the incident that gave rise to the disciplinary hearing. (Disciplinary Hr'g at 25). The alleged assault, even if it did occur, happened after the conduct giving rise to the misbehavior report occurred. As such, Defendant Gerwer had a proper basis to deny Mr. Tatum's testimony as his testimony would not be relevant to any issues or incidents that gave rise to the

disciplinary hearing. *See, e.g.*, *Kalwasinski v. Morse*, 201 F. 3d 103, 108–109 (2d Cir. 1999) (indicating that testimony on the record that no one else was present at incident gave rational basis for excluding plaintiff's witnesses as irrelevant and unnecessary). Moreover, at Plaintiff's request, Defendant Gerwer attempted to call another inmate who was present at the scene of the incident. *Id.* at 22.  That inmate, however, refused to testify. *Id.*  Finally, at Plaintiff's request, Defendant Gerwer called Officers Donovan and Germaine to testify. *Id.* at 32, 41, 43.  Thus, Defendant Gerwer's refusal to call Mr. Tatum did not violate Plaintiff's due process rights because Mr. Tatum's testimony was irrelevant, and Defendant Gerwer called other witnesses that Plaintiff requested.

Defendant Gerwer allegedly committed another due process violation when C.O. Germaine was permitted to testify even though he had failed to sign the misbehavior report as DOCS regulations require.  (Pl.'s Dep. at 85–87).  However, violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations.  *See Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (state law violation does not necessarily rise to the level of a constitutional violation).[9]  Plaintiff's claim that this error violated his

---

[9] "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky*, No. 01 Civ. 8235, 2002 U.S. Dist. LEXIS 17089, 2002 WL 31040370, at *13 n.21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward*, 458 F. Supp. 624, 627 (S.D.N.Y.1978)).

due process rights is further undermined because Defendant Germaine testified at Plaintiff's request.  (Disciplinary Hr'g at 43).

### D.   Impartiality

Finally, Plaintiff alleges that he was deprived of due process because Defendant Gerwer was not fair or impartial.  (Compl. at 15; Pl.'s Dep. at 82, 85–87).  "An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer."  *Allen v. Cuomo*, 100 F. 3d at 253, 259 (2d Cir. 1996).  An impartial hearing officer is "one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess the evidence he has not yet seen."  *Patterson v. Coughlin*, 905 F.2d 564, 569–70 (2d Cir. 1990); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts."  *Allen v. Cuomo*, 100 F.3d at 259.  "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally."  *Id.*  An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf*, 714 F. Supp. 2d 432, 437-38 (W.D.N.Y. 2010).

Plaintiff first accuses Defendant Gerwer of saying on the record that C.O. Nieves was a "good person."  (Disciplinary Hr'g at 48).  Later, Plaintiff claims that Defendant Gerwer made this statement off the record.  (Disciplinary Hr'g at 52).  A

23

review of the disciplinary hearing transcript shows Defendant Gerwer never made such a statement on the record.[10]  But even if Defendant Gerwer made such a statement, either on the record or off the record, it is not evidence of bias.  As the hearing officer, Defendant Gerwer could make credibility determinations.  *See Lewis v. Johnson*, No. 9:08-CV-482 (TJM/ATB), 2010 U.S. Dist. LEXIS 98116, at *39-40 n.25, 2010 WL 3785771, at *11 n.25 (N.D.N.Y. Aug. 5, 2010) (Baxter, Mag. J.) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *report-recommendation adopted*, 2010 U.S. Dist. LEXIS 98084, at *1, 2010 WL 3762016, at *1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.).  Moreover, a review of the record belies Plaintiff's accusation that Defendant Gerwer had pre-determined Plaintiff's guilt.  The disciplinary hearing spanned several weeks to locate witnesses and schedule a time for them to testify.  Plaintiff was permitted to call witnesses to testify on his behalf, and was permitted to cross-examine the witnesses against him. (Disciplinary Hr'g at 12, 32, 41, 43).  The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination.  *Sira v. Morton*, 380 F.3d 57,

---

[10] Plaintiff, however, kept accusing defendant Gerwer of stating that fact. (Disciplinary Hr'g at 48, 50).  At one point, plaintiff stated that "I object to this Hearing Officer on the grounds as she said on the record that Ms. Nieves is a good person. . . . so therefore I'm feeling like she feels like I'm the bad person." *Id.* at 48.  Defendant Gerwer then stated that she wanted to "clarify for the record" that she was "an unbiased Tier Hearing Officer." *Id.*  This court cannot find any statement on the record, made by Defendant Gerwer, that Officer Nieves was a "good person."  Later during the hearing, Defendant Gerwer interrupted plaintiff and stated that "I said that 'the testimony of Ms. Nieves was believable to this Tier Hearing Officer." *Id.*

76 (2d Cir. 2004) (citing *Superintendent v. Hill*, 472 U.S.445, 454 (1985)).  In this case, there was clearly sufficient evidence supporting the hearing officer's determination.  Thus, the record establishes that Defendant Gerwer was not biased and did not prejudge the evidence.  Accordingly, Defendant Gerwer's summary judgment motion with respect to plaintiff's due process claim should be granted.[11]

## VI.   **Qualified Immunity**

Defendants argue that they are entitled to qualified immunity with respect to all of Plaintiff's claims.  In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified, Person v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory in all cases").  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning

---

[11]  In his response to the summary judgment motion, Plaintiff asserts that Defendant Gerwer and others were engaged in a conspiracy to deprive him of his constitutional rights.  (Dkt. No. 43 at 12).  A civil rights conspiracy must be proven with specificity, as bare claims of illegal agreement, supported only by allegations of conduct easily explained as individual action, is insufficient.  *See Iqbal v. Hasty*, 490 F.3d 143, 177 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999).  Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end."  *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations omitted).  Conclusory, vague, and general allegations, such as those in this Plaintiff's response, are insufficient to support a civil rights conspiracy claim.  *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999).  In any event, as discussed herein, Plaintiff has not asserted any viable substantive constitutional claims that would support a conspiracy claim.

qualified immunity." *Saucier v. Katz*, 533 U.S. at 201.  Accordingly, this Court need not address qualified immunity with respect to Plaintiff's claims because, as discussed above, he has not established those alleged violations of constitutional rights.

      **WHEREFORE**, based on the findings above, it is

      **RECOMMENDED**, Defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED** and the complaint be **DISMISSED IN ITS ENTIRETY**.

      Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: March 1, 2011


**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**